It has been made a question whether a father who has been deprived of the services of a child, or a husband *Page 467 
who has lost the society and assistance of his wife, by acts of culpable negligence on the part of others, by means of which death has ensued, may not respectively maintain actions against the wrongdoer to recover damages for such an injury. Several of the cases in which that question has been discussed are referred to in Green v. The Hudson River Railroad Company (28 Barb., 9); and the opinion of the Supreme Court in that case itself examines the point with care and ability. The present action does not in any way involve that controversy, and, as the case just referred to is understood to be pending in this court on appeal, it is intended carefully to abstain from the expression of any opinion upon it. The plaintiff in the case before us does not occupy any other relation to the deceased than that of the administrator of his estate; and it has never been suggested, so far as I know, that the personal representatives of a deceased person could, at the common law, sustain an action on account of the wrongful act of another which caused the death of the person whose estate they represent. The plaintiff, accordingly, bases his claim solely upon the acts of 1847 and 1849. These acts do authorize a recovery for such a wrong, in a case in which the deceased, if he had survived, could himself have maintained an action for the injury; and the damages recovered are declared to be for the benefit of the widow and next of kin of the deceased. The averments of the complaint bring the case precisely within the provisions of the statute, provided they apply to injuries of this kind, not committed within this State, but in a foreign country; and the single question to be determined is, whether they do apply to such cases.
The statement of a few general principles which cannot possibly be the subject of controversy, and for which no authority need be cited, will greatly simplify the discussion. In the first place, the courts do not, in general, take notice of the laws of a foreign country, except so far as they are made to appear by proof. In the absence, however, of positive evidence as to the law of another country, our laws indulge in certain presumptions.Prima facie, a man is entitled to personal freedom *Page 468 
and the absence of bodily restraint, and to be exempt from physical violence to his person, everywhere. Hence, if one bring a civil action for false imprisonment, or for an assault and battery committed abroad, he need not, in the first instance, offer any proof that such acts are unlawful, and entitle the injured party to a recompense in damages, in the place where they were inflicted; for the courts will not presume the existence of a state of the law in any country by which compensation is not provided for such injuries. And where the condition of the law of another State becomes material, and no evidence has been offered concerning it, our courts will presume that the general principles of the common law, which we always consider to be consonant to reason and natural justice, prevail there. But no such presumption obtains respecting the positive statute law of the State. There is, generally, no probability, in point of fact, and there is never any presumption of law, that other States or countries have established, precisely or substantially, the same arbitrary rules which the domestic legislature has seen fit to enact.
In applying these remarks to the present case, we are brought to the conclusion that the statutes under which this action is instituted do not, so far as we know, or can assume, form any portion of the law of New Grenada, where the facts constituting the supposed cause of action occurred. These statutes have introduced a principle wholly unknown to the common law, namely, that the value of a man's life to his wife or next of kin, constitutes, with a certain limitation as to amount, a part of his estate which he leaves behind him to be administered by his personal representatives. The contrary doctrine, to wit, that a cause of action existing for such a wrong in favor of the party injured, dies with him, and forms no part of the succession to which his wife and kindred are entitled, was so well established as to form one of the standing maxims of the law. (Broom's Legal Maxims, p. 400.) Besides, by the general principle of the law of England and of this country, the personal estate of a deceased person, distributable to his widow and next of kin, consists only of the residue *Page 469 
remaining after the payment of his debts. In other words, the creditors are the primary claimants of the succession, and the executor or administrator represents their interests. But under these statutes the creditors are passed by, and the whole of the proceeds of the recovery goes to the surviving relatives. Again, although the action can be maintained only in the cases in which it could have been brought by the deceased, if he had survived, the damages nevertheless are given upon different principles and for different causes. In an action brought by a person injured, but not fatally, by the negligence of another, he recovers for his pecuniary loss, and in addition for his pain and suffering of mind and body, while under the statute, it is not the recompense which would have belonged to him which is awarded to his personal representative; but the damages are to be estimated "with reference to the pecuniary injuries resulting from such death to the wife and next of kin of such deceased person." This is a subject of damages which could not possibly have had any application in an action brought by the party injured if he had survived. This peculiarity has been noticed by Mr. Justice COLERIDGE in Blake v. The Midland Railway Company, (10 Eng. L. E., 443,) in commenting on the British statute, (9 and 10 Victoria, ch. 93,) which is nearly like our own. The plaintiff, in a case under that statute, was allowed to recover for the mental sufferings of the wife on account of her husband's loss; but this was held to be erroneous by the Court of Queen's Bench. The learned Justice, in pronouncing the opinion of the court, refers to an argument of the plaintiff's counsel, that if the deceased had recovered he would have been entitled to asolatium, and that therefore his representatives ought to be allowed it; "but," he says, "it will be evident that this act does not transfer this right of action to his representative, but gives to his representative a totally new right of action on different principles." "The measure of damages," he adds, "is not the loss or suffering of the deceased, but the injury resulting from his death to his family." It may well be that if King had survived his injuries, he could have sustained an action against the defendants *Page 470 
in the courts of this State, grounded on the presumption that the laws of New Grenada coincide with the rules of the common law in respect to injuries to the person arising from the negligence of another. But the suggestion that the present action is brought to enforce the right which the common law gave to the deceased, and that the provisions of our statute should be considered as affecting only the remedy, which may always be regulated by thelex fori, is not, in my opinion, sound; for it is not a simple devolution of a cause of action which the deceased would have had which the statute effects, but it is an entirely new cause of action which is here sought to be enforced. The system of the statute, as well as of the common law is, that the right of action for damages on account of his bodily injuries, which belonged to the deceased while he lived, was extinguished by his death. The statute does not profess to revive his cause of action in favor of the executor or administrator. The compensation for the bodily injuries remains extinct, but a new grievance of a distinct nature, namely, the deprivation suffered by the wife and children, or other relatives, of their natural support and protection, arises upon his death and is made by the statute the subject of a new cause of action — in favor of these surviving relatives, but to be prosecuted in point of form by the executor or administrator. The reference in the first section of the statute of 1847, to the ability of the deceased to maintain the action if death had not ensued, is inserted solely for the purpose of defining the kind and degree of delinquency with which the defendant must be chargeable in order to subject him to the action. The act, neglect or default must be such as would (if death had not ensued) have entitled the party injured to maintain an action, c.
I have thus far assumed without a formal statement of the principle that the statutes referred to have no force beyond the limits of the State of New York. This is an elementary doctrine, and the contrary was not insisted upon as a general rule on the argument The laws of New York have no greater operation, in respect to transactions which take place wholly *Page 471 
within the territories of New Grenada, than the laws of that republic have in regard to New York transactions. It is no doubt within the competency of the legislature to declare that any wrong which may be inflicted upon a citizen of New York abroad, may be redressed here according to the principles of our law, if the wrongdoer can be found here, so as to be subjected to the jurisdiction of our courts; but as we could not by any legislation of this kind put an end to the liability of the party to the lex loci, or divest the foreign government of its jurisdiction over the case, such a statute would rarely be just in its operation, and would be more likely to lead to confusion and oppression than to any beneficial results. Hence, legislation of the kind suggested has not found any place in the statute books of modern nations, except in the case of laws respecting the army and navy, which, when operating abroad, must of course be governed by the laws enacted by the government of the country which sends them forth, and except also in regard to foreign commerce prosecuted in our own vessels. In such cases the fleets and armies, and ships of commerce carry with them the nationality which originally belonged to them. Prima facie all laws are coeumlxtensive, and only coeumlxtensive with the political jurisdiction of the law-making power. (Story's (Confl. Laws, § 18-20; United States v. Bevans, 3 Wheat., 336, 386; 3 Dall., 320 — Translations from Huberus; Bank of Augusta v. Earle, 13 Pet., 519.) This limitation upon the operation of the laws of a country is quite consistent with the practice which universally prevails, by which the courts of one country entertain suits in relation to causes of action which arise in another country, when the parties come here so as to be made subject to their jurisdiction. Whatever liability the defendants incurred by the laws of New Grenada, by the act mentioned in the complaint, might well be enforced in the courts of this State; the defendant as a domestic corporation being readily compellable to answer here. But the rule of decision would still be the law of New Grenada, which the court and jury must be made acquainted with by the proof exhibited before them. *Page 472 
I have, thus far, omitted to notice the argument of the plaintiff's counsel arising out of the circumstance that the defendants are a corporation created by the laws of the State of New York, for the purpose of constructing and running a railroad in Central America. He deduces from that fact the conclusion that they are fully subject to our laws for acts done in all places, and especially in the jurisdiction in which the principal object of their incorporation is carried on. On the contrary, I have applied to them the same rules which would have governed a natural person going from this State to conduct a business enterprise upon the isthmus of Panama; and I think there is no distinction, so far as concerns this question, in the two cases. There is no pretense that the government of New Grenada has ceded to the State of New York any part of her jurisdiction or sovereignty over the territory occupied or used by the railroad company. The act incorporating the defendants suggests that three of the corporators — Aspinwall, Stephens, and Chauncey — had obtained a grant of a right to construct the railroad from the New Grenadian government, and the company was authorized to purchase from these persons the rights so obtained; but there is no proof, or any reason to believe, that the grant was intended to transfer any political or judicial rights whatever. All which can be inferred from the statements in the statute is, that the local government had conferred upon these individuals the right to construct and operate a railroad, and to purchase and hold lands for that purpose, notwithstanding their alienage. If Mr. Aspinwall and his two associates had constructed and had run the road under their grant, there could, of course, be no pretense for exempting them from the operation of the laws of the country, or for applying to their transactions in that locality the laws of New York, any more than there would be for attaching the same consequences to the acts of any other citizen of New York who should go to a foreign country in the pursuit of his own private business. It would be the common case of persons leaving their own country to transact business in another. No one would pretend that they carried the laws of the country *Page 473 
of their origin with them. But the legislature of this State consented to incorporate these grantees and other persons who had associated with them, in order that the company thus formed might concentrate the necessary capital to prosecute the work, and be enabled conveniently to transact their business by maintaining a perpetual succession, using a common name, and exercising the other attributes of a corporation. The legislature did not profess to confer upon them any rights in New Grenada, or to exempt them from any liabilities which would attach to natural persons there, or to retain over them any jurisdiction or control in respect to their liabilities to persons with whom they might come in contact in the course of their business in New Grenada. In my opinion the case does not differ, in the respect under consideration, from what it would have been if the grantees and their associates had entered into a partnership or private association for the purpose of carrying on their enterprise. The act simply creates an artificial person to represent the interests of the several natural persons who took shares in the undertaking. Acts of incorporation necessarily specify the particular business which the artificial body is authorized to carry on. This is essential in order to enable the government to restrain the corporation should it attempt to prosecute a general business, and thus compete with individual enterprise. It was accordingly stated in the act that the purpose was to construct a railroad across the isthmus. This was a business which could only be carried on in that region, and, therefore, so far as the legislature of New York was concerned, they were authorized to proceed there and to prosecute their enterprise, if they should be permitted so to do by the local government. I am unable to see any necessity for retaining over them any of the domestic laws or institutions of this State. There is not, as has been remarked, any indication of an intention to do so; and it is entirely certain that our legislature had no power to exempt them from amenability to the laws of New Grenada. Many corporations are created by this State for the transaction of a business which is not strictly local in its character as in the instance of banks *Page 474 
and insurance companies. Though the seat of their business is in a certain town or city, portions of it may be transacted in other States or countries. It has been decided that a bank, chartered by and located in one State, may purchase exchange in any other. This was affirmed in the well-considered case of The Bank ofAugusta v. Earle (13 Pet., 519). Such a purchase of a bill of exchange in Alabama was held to be within the corporate powers of the plaintiffs, who were a corporation created by the legislature of Georgia. But the court said that the validity of the transaction depended wholly upon the laws of the sovereignty in which it took place. Had a question arisen concerning the validity of the bill of exchange purchased, it would have been the laws of Alabama, where it was made, and not those of Georgia, which must have been appealed to, although one of the contracting parties was a Georgia corporation. It can make no difference, I conceive, whether the act of incorporation expressly, or only by implication, authorizes the company to perform corporate acts out of the State which created it. In either case the quality and legal effect of the acts, and the liabilities which they entail upon the parties, depend solely upon the laws of the sovereignty within which they are transacted.
It would be easy to illustrate the correctness of these positions by referring to the preposterous results which would follow from a different rule. Suppose the government of New Grenada to have enacted that the proprietors of a railroad company should not be responsible for the negligence of its servants, provided there was no want of due care in selecting them; it could not be pretended that its will could be set at naught by prosecuting the corporation in the courts of another State where the law was different. Or suppose that government had passed a statute like ours, except that the amount which might be received was unlimited, no one, I presume, would deny that the full amount of damages which could be proved might be recovered, though it might exceed the limit in our statute, in whatever court the suit might be brought. The true theory is, that no suit whatever respecting this *Page 475 
injury could be sustained in the courts of this State, except pursuant to the law of international comity. By that law foreign contracts and foreign transactions, out of which liabilities have arisen, may be prosecuted in our tribunals by the implied assent of the government of this State; but in all such cases we administer the foreign law as from the proofs we find it to be, or as without proofs we presume it to be. The cases of Rafael
v. Verelst (2 W. Black., 1055), and Mostyn v. Fabrigas
(Cowp., 161), were decided upon the presumption respecting the foreign law to which I have referred. Both cases were actions in the English courts for the imprisonment of the respective plaintiffs in foreign countries. The principle applicable to the present question was not much discussed, but Lord MANSFIELD said, in the last case, that whatever would be a justification in the place where the thing was done, ought to be a justification where the case was tried; thus putting the liability of the defendant upon the provisions of the foreign law. The question involved in this case has been several times before the Supreme and Superior Courts, and the views which I entertain respecting it have been frequently enforced in elaborate and well-considered opinions. The decisions have been adverse to the right to maintain the action except in a single case where the plaintiff prevailed at a special term; but that judgment was reversed on appeal to the general term. (Vandenwater v. The N.Y. N.H.R.R. Co., 27 Barb., 244; Beach v. The Bay State Co., id., 248; thiscase, 3 Bosw., 67; Crowley v. The Panama R.R. Co., 30 Barb., 99; Beach v. The Bay State Co., on appeal, id., 433.)
I am of opinion, with the Superior Court, that the acts of 1847 and 1849, do not apply to cases of death caused by the negligence or wrongful act of another, where the transaction occurred in a foreign country, and consequently that the judgment appealed from should be affirmed.